YOLANDA SANTIAGO                         :     CIVIL ACTION NO.  **FILED**
    Plaintiff                              :     3:00CV2386 (WIG)

VS.                                     :     2003 NOV 12  A 10: 28

CITY OF HARTFORD;                       :     US DISTRICT COURT
HARTFORD POLICE DEPARTMENT              :     BRIDGEPORT CT
OFFICER JULIO CAMACHO                   :
    Defendants                             :     NOVEMBER 11, 2003

## MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

The Plaintiff, Yolanda Santiago ("plaintiff") has initiated a Five Count complaint against Defendant City of Hartford ("City"), Hartford Police Department ("Police Department") and former Hartford Police Officer Julio Camacho ("Camacho") for damages and violations to the plaintiff's constitutional rights as a result of a sexual assault committed by Camacho against the plaintiff in December of 1997. Defendant City and Police Department have moved for summary judgment on the Fourth and Fifth Counts of said complaint.

### II.   FACTUAL BACKGROUND

In December of 1997, the plaintiff exited a twenty-four hour store located at the intersection of Albany Avenue and Bedford Street in Hartford, Connecticut at approximately 9:00 A.M. *Complaint,* First Count, Paragraph 11. At said time and place, the plaintiff was approached by Camacho and accused of making a drug sale which the plaintiff denied. Id., Paragraph 12. Camacho told the plaintiff to enter his police cruiser, and the plaintiff complied. Id., Paragraph 13. Camacho drove to 410 Windsor Street, Hartford Connecticut which is a dark area located near railroad tracks. Id., Paragraph 16.

Camacho demanded that the plaintiff perform sexual intercourse or he would arrest her. Id., Paragraphs 17, 19. The plaintiff refused to cooperate, but Camacho grabbed the plaintiff, forcefully removed her clothing and proceeded to have intercourse with the plaintiff without her consent. Id., Paragraphs 20-21. After completion of the act of intercourse, Camacho drove the plaintiff to a nearby corner and dropped her off. Id., Paragraph 23.

Fearing she would be arrested and put in jail, the plaintiff did not report the assault immediately. Id., Paragraph 24. A few moths later, the plaintiff called the Hartford Police department to report being assaulted by a Hartford Police officer. Id., Paragraph 25. The plaintiff did not know the name of the officer, and was told by the Hartford Police Department that they could not do anything about it, and hung up the phone on the plaintiff. Id., Paragraph 26. In August of 2000, plaintiff was watching a television program in which she saw a picture of Camacho. Id., Paragraph 27. Having immediately recognized Camacho as the officer who had assaulted her, she immediately called the Hartford Police Department to report that Camacho was the officer who had assaulted her in December of 1997. Id., Paragraph 28.

III.   **ARGUMENT**

### A.   **Standard of Review**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be granted if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its]

case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### B.    Whether the Defendants violated the Plaintiff's civil rights is a question of fact, not a question of law.

The Supreme Court has required that a plaintiff seeking to impose liability upon a municipality under 42 U.S.C. § 1983 to identify a municipal "policy" or "custom" which caused the plaintiff's injury. Monell v. New York City Dept. of Social Services, supra, at 694; Commissioners of Bryan County v. Brown, 520 U.S. 397 (1997).  Municipal liability also may be based on a claim of inadequate training "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [such that the failure to train] can be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton v. Harris, 498 U.S. 378, 389 (1989).

Whether the City had a policy or custom which caused the plaintiff's injuries is a question of fact. The plaintiff testified at her deposition that shortly after her assault, she reported the incident to the Hartford Police Department. Exhibit A, Plaintiff's Deposition, page 90, lines 1-2. The plaintiff testified that when she reported the incident in 1998,  she was told by the woman on the phone that there was nothing that could be done and had the telephone hung up on her. Id., page 93, lines 6-10. The plaintiff called again in August of 2000, and reported that Camacho had been the officer who had assaulted her in December 1997. Id., page 93, lines 1-6. Only after that call was the FBI dispatched to investigate the matter further. Id., page 93, lines 20-24. Whether the Police Department's

failure to investigate the plaintiff's report in 1998 can be properly thought of as a city

policy or custom is a question of fact, not a question of law.

In October of 1998, a task force was assembled to investigate allegations of

corruption within the Hartford Police Department. Exhibit B, Notice of Related Cases,

United States v. Julio Camacho, Criminal No. 00CR215(AVC), December 19, 2000.

The task force, which was comprised of Special Agents of the Federal Bureau of

Investigation, Inspectors from the Chief States Attorney's Office and members of the

Hartford Police Department, resulted in several indictments against City of Hartford

Police Officers. Id. The need for such a widespread task force into Department-wide

corruption certainly raises an issue of fact as to whether there was a policy or custom

which caused injury to the plaintiff. Monell, City of Canton, supra.

From 1993 through December 1998, there were fourteen documented allegations

of sexual misconduct against Hartford Police officers. Exhibit C, Affidavit of Neil Dryfe,

Paragraph 8. As there were a high number of incidents involving Hartford Police officers,

certainly this raises a question as to whether the high number of incidents of sexual

misconduct involving Hartford Police officers could be construed as a policy or custom

of the Hartford Police department. Whether fourteen incidents in five years constitutes a

custom or policy or deliberate indifference is not a matter of law. Such a determination is

a question of fact, which should be decided by the trier of fact. City of Canton, supra. As

there is a genuine issue as to a material fact, the defendants motion for summary

judgment must fail. Celotex Corp., supra.

One of the aforementioned complaints included another complaint against

Camacho. Id., Paragraph 9. The previous complaint involved an incident in 1994 in

which it was alleged that Camacho forced himself on a woman whom he was investigating. <u>Id.</u> Despite this incident, Camacho was not disciplined, and the case was closed. <u>Id.</u> The fact that Camacho was involved in multiple incidents regarding sexual assault and violations of constitutional civil rights raises the question as to whether the City of Hartford and/or the Hartford Police Department's action of keeping Camacho on the force and failure to properly train him amounted to deliberate indifference. Again, as this issue is an issue of fact not an issue of law, and therefore the defendants motion for summary judgment must fail.

IV.    **Conclusion**

WHEREFORE, for the foregoing reasons, the plaintiff respectfully requests that the Court deny defendants City of Hartford ands Hartford Police Department's Motion for summary Judgment.

PLANITIFF,
YOLANDA SANTIAGO

BY: _____
Angelo Cicchiello, Esq.
Law Offices of Angelo Cicchiello
364 Franklin Avenue
Hartford, CT 06114
(860) 296-3457
Federal Bar No. CT 06503

## CERTIFICATION

This is to certify that on this 11th day of November, 2003, the foregoing was

mailed, postage prepaid, to:

Brian P. Leaming, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

William J. Melley, Esq.
250 Hudson Street
Hartford, CT 06106

_____
Angelo Cicchiello, Esq.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

3   YOLANDA SANTIAGO

4              PLAINTIFF

5   VS.                                    CIVIL ACTION

6                                          NO. 300CV2386SRU

7   CITY OF HARTFORD, HARTFORD

8   POLICE DEPARTMENT, OFFICER

9   JULIO CAMACHO

10             DEFENDANTS

11

12          DEPOSITION OF YOLANDA SANTIAGO

13

14  APPEARANCES:

15       LAW OFFICES OF ANGELO CICCHIELLO

16       BY:  DAVID COMPAGNONE, ESQ.

17            364 FRANKLIN AVENUE

18            HARTFORD, CONNECTICUT

19            ATTORNEYS FOR THE PLAINTIFF

20       HALLORAN & SAGE

21       BY:  BRIAN P. LEAMING, ESQ.

22            ONE GOODWIN SQUARE

23            225 ASLYM STREET

24            HARTFORD, CONNECTICUT

2

-AND-

KENNY, BRIMMER, MELLEY & MAHONEY

BY:   WILLIAM J. MELLEY, III, ESQ.

FIVE GRAND STREET

HARTFORD, CONNECTICUT

ATTORNEYS FOR THE DEFENDANTS


            Deposition of Yolanda Santiago taken on behalf

of the defendants in the hereinbefore entitled matter,

pursuant to Notice of Deposition before Harold J.

Moan, Sr., a Notary Public duly qualified and authorized

to administer oaths in and for the State of Connecticut,

held at the law offices of Kenny, Brimmer, Melley &

Mahoney, Five Grand Street, Hartford, Connecticut, on

the 27th day of June, 2001.


                    S T I P U L A T I O N S

IT IS STIPULATED AND AGREED THAT:

(A) Any defect in the Notice is waived;

(B) That Harold J. Moan, Sr., is a duly authorized

        Notary Public in and for the State of Connecticut;

(c) That all objections except as to form are reserved

        to the time of trial:

Q   You did not want to go to jail?

A   No.

Q   Why do you say that you did not want to go to jail?

A   Because at the time he said that he was arresting me for something that I wasn't doing.  I knew that his word means more than mine and whatever he would have said it would put me in jail.

Q   All right.  Now, do you remember the day that you had this encounter with Officer Camacho?

A   No.

Q   Do you remember what day of the week it was?

A   No.

Q   Can you tell us whether or not it was a weekend or weekday?

A   I don't remember.

Q   Do you remember what the weather was like?

A   It was cold and it was getting dark.

Q   Do you remember if there was any snow on the ground?

A   No.

Q   Do you remember if there was any snow anywhere?  In other words, had it snowed at all?

A   No.

Q   So the lawns and the grass, you could see the grass and everything?  No snow?

1    A    From the beginning?  I was getting out of a light

2    blue car, which was a black dude driving and a white lady

3    in the front.  I was in the back seat.  I was getting out

4    of the car and Officer Camacho was parked in front of the

5    twenty-four hour store on Albany Avenue in the driveway.

6    As I got out of the car, which he did see me, when they

7    left, the people that I got out of the car left, I went by

8    him and went inside the store.  When I came out of the

9    store he stopped me.  He said come here.  So, I walked up

10    to him and he said, you know, I saw you.

11    Q    Wait.  Before we get there I want to just back up.

12    I don't want you to go too far ahead of me.  You said that

13    you got out of a blue car?

14    A    Yes.

15    Q    Where had you been?

16    A    I don't remember where it was, but they were

17    dropping me of there.

18    Q    Who were they?

19    A    They were just friends.  Well, not friends, you

20    know, just people that I used to hang with sometimes.

21    Q    How long had you been with them?

22    A    I had jut got -- they were at the Motel 6 and I

23    caught a ride with them to Hartford.  That is where they

24    dropped me off.

1    Q    Motel 6 is that where you were living at that time?

2    A    Yes.

3    Q    And did they also live there?

4    A    I don't think so.

5    Q    All right.

6    A    I think they were just there that night or that day,

7    whatever.

8    Q    Where were you going that they dropped you off?

9    A    I was going to the store on Albany Avenue, the

10    twenty-four hour store.

11    Q    Motel 6 was where?

12    A    Rocky Hill.

13    Q    Why would you go to Albany Avenue to go to the

14    store?

15    A    Because at the time I used to get high and I used to

16    hang out there.  I used to go to meet friends and get my

17    stuff and go back home.

18    Q    Were you a regular in the general area of the twenty-

19    four hour store?

20    A    Not really.

21    Q    How often would you be there?

22    A    Like once or twice a month, you know.

23    Q    How many different places would you go in general in

24    the course of a month?

glasses or a beard?

    A   No, he didn't have nothing.

    Q   Anything that was unusual about his person?

    A   No.

    Q   Did you notice anything about his uniform?  I mean, anything unusual?

    A   No.  I also seen him around that area as a police officer.

    Q   Had you ever spoken to him before?

    A   No.

    Q   Had you ever seen him speaking to somebody else?

    A   No.

    Q   What was he doing when you had seen him on other occasions?

    A   Other occasions?

    Q   Yes.

    A   Just driving by in his cruiser.

    Q   Was he by himself?

    A   Yes.

    Q   Did you ever see another cruiser in the area that night?

    A   No.

    Q   So you come out of the store and what does he say to you?

1    Q    All right.

2    A    Three different times.

3    Q    Do you remember if they ever talked to you where

4    they had somebody with a machine, like that?

5    A    I don't remember.

6    Q    When did you first talk to the FBI?

7    A    When I first saw Camacho on television, the news.

8    Q    How did you talk to them?

9    A    They came to Motel 6.

10   Q    Did you call them up or --

11   A    I called the police department in Hartford and told

12   them that the police officer that had just came out on the

13   news had raped me.

14   Q    All right.  So, just to back up.  You get to 410

15   Windsor Street and you say he drives around back?

16   A    Yes.

17   Q    Is that right?

18   A    Yes.

19   Q    What happens?

20   A    We get back there and I told him, what are we doing

21   back here.  He got out and he opened my door and he told me

22   to step out.  I stepped out and he said, let's talk a deal.

23   You get me some of that and I won't arrest you.  He was

24   pointing at my vagina.  I was scared and afraid and I

82

1    didn't know what he was going to do.  I said okay.  I asked

2    him where and he said right here.  I said it is cold and he

3    said, don't worry, it is not going to take me long.  He

4    liked it doggy style.  He told me to put my hands on the

5    front seat doggy style and he did what he did.  It took him

6    about seven to eight minutes.  Then he told me, I told you

7    it wouldn't take that long.  I asked him what are you going

8    to do with me now.  He said, I will drop you off and he

9    dropped me off on the corner of Brook and Albany.  Before

10   he dropped me off he said, hurry up and get out, I have a

11   run to do, they have a chase.

12        Q    Now, you said he told you to put your hands on the

13   front seat?

14        A    Yes.

15        Q    The driver's side or passenger side?

16        A    Passenger side.

17        Q    Where were you seated before you got there?

18        A    In the back.

19        Q    What side did you get out?

20        A    I got out on the passenger side.

21        Q    Did he open the front door then?

22        A    He opened the back door for me to get out in the

23   front -- not in the front, but me in the position that he

24   wanted me.

1    A    You asked me from the time I left --

2    Q    Right up until when he dropped you back off?

3    A    It took like -- I don't know.  I really can't tell.

4    Maybe like forty minutes at the most.  I don't know.

5    Q    Did you go anywhere else?

6    A    I went home.

7    Q    With him?

8    A    With him?  No.

9    Q    So when you got back to where he dropped you off on

10   Albany Avenue, where did you go from there?

11   A    I went home.  I was scared and went home.

12   Q    How did you get home?

13   A    I took a cab.  I had money and took a cab back to

14   the hotel.

15   Q    What did you do when you got home?

16   A    I just started crying.  I couldn't believe what

17   happened to me.  I didn't get to tell nobody.  I mean, it

18   was very frustrating.

19   Q    When was the first time you ever mentioned this to

20   anybody?

21   A    When?  When I saw him on TV.

22   Q    Where were you when you saw it on TV?

23   A    In my room in Motel 6.

24   Q    Were you by yourself?

A   Yes.

Q   Had you ever told anybody in between the time that
it happened and when you saw it on TV?

A   No.

Q   What do you remember about the TV show?

A   I remember I had just woke up and that was the first
face I saw.  I called the police department and I told them
that that officer had raped me.

Q   What did they say?

A   The guy -- I tried to call like way back and the
people that were there at the police department didn't
believe me.  They hung up the phone on me.

Q   You are confusing me.

A   I tried calling when Camacho raped me, as soon as he
raped me, I called the police department like a month or
two later.

Q   All right.  Let's stop, because I asked you before
when you first mentioned it to anybody, about what
happened.  You said there was no one.

A   Yes.

Q   Let's go back.

A   Yes, I did.

Q   The incident happened and when was the first time
you mentioned to anybody about what happened?

1     A    Like two months later I tried calling the police

2 department and a lady picked up.

3     Q    Wait a minute.  Before that had you spoken to

4 anybody about what happened before you made the phone call?

5     A    No.

6     Q    Had you told any friends or your husband or family

7 members or somebody that you were doing drugs or drinking

8 about what happened?

9     A    Nobody.

10     Q    Nobody?

11     A    No.

12     Q    Had you been to the hospital at all?

13     A    No.

14     Q    So two months later you picked up the phone and a

15 woman answers.  Where is the woman?

16     A    At the police station in Hartford.

17     Q    Where she was working or she just answers the phone?

18     A    I guess so.

19     Q    Was she in any department?

20     A    She was the first one that picked up the phone.

21     Q    And what did you tell her?

22     A    I said my name is Yolanda Santiago and I am calling

23 because I was raped by a police officer.  She said what is

24 his name.  I said that I don't know his name.  She said we

1    can't help you and that was it.

2        Q    When you made the phone call did you speak in

3    English or Spanish?

4        A    English.

5        Q    Is English your first language?

6        A    Yes.

7        Q    Yes?

8        A    Yes.

9        Q    Do you speak Spanish?

10       A    Yes.  A little.

11       Q    When you talked to this officer on this day, was

12   everything in English or Spanish?

13       A    English.

14       Q    Do you remember anything about his accent?

15       A    The lady that I spoke to?

16       Q    The officer.

17       A    The second time I called?

18       Q    I'm sorry.  I am confused.

19       A    I am telling you when I first called a lady, not a

20   man --

21       Q    Forget that.  The officer that did this, what you

22   described behind 410 Windsor Street, did that person have

23   an accent of any kind?

24       A    Puerto Rican accent.

1    Q    So the first lady, did she ask you your name?

2    A    Yes.

3    Q    Did she ask you where you lived?

4    A    No.

5    Q    Did she ask you when this happened?

6    A    She didn't ask me nothing.  I told her my name,

7    Yolanda Santiago, and I am calling to tell you I was raped

8    by a police officer, and just because I didn't know his

9    name she said we can't help you.  She hung up the phone on

10   me.

11   Q    She hung up?

12   A    Yes.

13   Q    This was the first time you ever spoke to anybody

14   about this?

15   A    Yes.

16   Q    Is that right?

17   A    Yes.

18   Q    When was the next time you spoke to anybody about

19   this?

20   A    When I saw him on TV sometime last year.

21   Q    What happened?

22   A    I was watching the news and the first one that came

     on was him.

     Q    What do you remember the TV show saying about

1    Officer Camacho?

2        A    That he was being arrested for suspect of murder --

3    I know it was about murder something, but I can't remember

4    what it was.  He had no bond and from there I called.

5        Q    All right.

6        A    I was watching TV and I called.

7        Q    When you called the second time who did you speak

8    to?

9        A    A male.

10       Q    How many people did you speak to before you spoke to

11   this person?

12       A    From him he said hold on.  He passed me to somebody

13   else, another man.  He started asking me questions and

14   investigating me.  He said, is it possible that we could

15   send someone right now to meet with you.  It was one

16   o'clock in the morning.  A police officer raped me and

17   another officer to come to my room.  I said no, no.  He

18   said don't worry, it is going to be a lady.  I explained to

19   him why not and said, I am afraid.  He said, don't worry

20   there will be a female officer.  I told him no, no.  So, he

21   left it that the next day would it be possible for someone

22   to speak to you and I said yes.  Early in the morning,

23   around nine o'clock the FBI was at my door.  It was two FBI

24   agents and a female lady, two guys and -- three guys and a

1    Camacho raped you, did you consent to that because you

2    were scared?

3        A    I don't understand.  If I wanted to?

4        Q    Did you want to have sex with Officer Camacho?

5        A    No.

6        Q    Why did you have sex with Officer Camacho?

7        A    Because I didn't have no choice.  I didn't know

8    what he had in mind to do with me, if I said no to him.

9    He is a police officer.

10       Q    Did he threaten to arrest you if you didn't

11   have sex with him?

12       A    Yes.

13       Q    Were you scared?

14       A    Of course.

15       Q    And regarding exactly when this happened I have some

16   follow-up questions.  Regarding the week before Christmas

17   when you think back on this, are you absolutely sure it was

18   the week before Christmas or could it have been two

19   weeks before?

20       A    No, a week before Christmas, around there.  It was

21   very close to being Christmas and I didn't want to go to

22   jail.

23       Q    Do you know, as we are sitting here today, of the

24   exact date that it would have happened?

DEPONENT'S    CERTIFICATION

CASE NO. 300CV2386SRU

YOLANDA SANTIAGO,                                    UNITED STATES DISTRICT COURT

                            PLAINTIFF

VS.

CITY OF HARTFORD, HARTFORD POLICE               DISTRICT OF CONNECTICUT

DEPARTMENT, OFFICER JULIO CAMACHO

I, Yolanda Santiago, do hereby certify that the

foregoing is  a true and accurate transcript of my testimony  in

the above-mentioned matter, heard at the law offices of

Kenny, Brimmer, Melley & Mahoney, Five Grand Street, Hartford,

Connecticut, on the 27[h] day of June, 2001

Dated at                          , Connecticut, this       day of

                    , 2001.

_____

                            YOLANDA SANTIAGO

Yolanda Santiago personally appeared before me and is known to

be the person who has subscribed and executed the foregoing deposition

and has acknowledged that she executed the same as her free act and deed.

Dated at _____, Connecticut, this _____ day of

_____, 2001.

_____

NOTARY PUBLIC

Q    Who was monitoring you throughout this whole time, Dr. Ross?

A    Dr. Ross, yes.

Q    How often would you be seeing him in that period that you just described '96 through '99?

A    I see my doctor every four or five months.

Q    So if we look at the time period the end of 1997, do you remember if you were on any medication at that time? At that time when this happened with Officer Camacho.

A    Yes.

Q    Were you on AZT?

A    Compovir.  It is like AZT.

Q    Did that cause you to have any side effects?

A    No.

Q    Now, according to what is alleged here, you had this incident with Officer Camacho at some time in December of '97, is that right?

A    Yes.

Q    Have you kept any kind of diary or notebook or calendar that you have marked?

A    No.

Q    How do you remember it was December of '97?

A    I remember because it was almost Christmas and I didn't want to go to jail.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :

-vs-                              :          Criminal No. 00CR215(AVC)

JULIO CAMACHO                     :


**NOTICE OF RELATED CASES**

I.    **Preliminary Statement**

Beginning in or about October 1998 a task force was assembled to investigate allegations

of corruption within the Hartford Police Department.  The task force was comprised of Special

Agents of the Federal Bureau of Investigation, Inspectors from the Chief States Attorney's Office

and members of the Hartford Police Department.  The task force investigation, to date, has

resulted in the return of a number of indictments against City of Hartford Police Officers.  More

particularly, the following criminal cases resulted: *United States v. Rivera,* 3:99CR63(AWT);

*United States v. Abbateillo,* 3:99CR62(AWT); *United States v. Pizarro,* 3:99CR61(AWT); *United*

*States v. Basile,* 3:99CR64(PCD); *United States v. Gallo,* 3:00CR100(AWT); *United States v.*

*Beauchamp,* 3:99CR257(AWT) and *United States v. Richards,* 3:00CR26(AWT) (*Richards* is

not a police officer but a related false statement prosecution).  All of these matters, save one,

were assigned to the Honorable Alvin H. Thompson.  All of the police cases involved common

charges, *i.e.,* allegations of violation of Title 18 U.S.C. §242 (the civil rights statute) and similar

legal issues were presented in pretrial litigation (*e.g.* severance issues, motions to dismiss *etc.*)..

Counsel in *United States v. Basile* filed a motion to recuse Judge Thompson inasmuch as

counsel for the defendant was representing a plaintiff in a malpractice case against Judge Thompson's former law firm. Although Judge Thompson had no involvement in the action that led to the malpractice claim, it was alleged that his position as managing partner of the firm presented grounds for recusal. In the exercise of the Court's discretion, Judge Thompson granted the recusal motion and the *Basile* matter was reassigned to Judge Dorsey. All other cases in connection with this investigation were handled by Judge Thompson including four guilty pleas, two trials and all the attendant motion practice.

Rule 10(d)(1) of the Local Rules of Civil Procedure (not expressly adopted by the Local Rules of Criminal Procedure) provides:

> 1) All cases will be assigned to a single Judge from filing to termination. In the event that it is subsequently determined that there is pending in this District a related case, or, if one is later filed, such case should normally bas assigned to the Judge assigned to the earliest filed case. A case may be re-assigned at the discretion of the Chief Judge.

This Rule was adverted to by then Chief Judge Cabranes in *McCann v. Westinghouse Electric Co.*, 1992 WL 336760 (D. Conn. Oct. 1, 1992) when the Court observed: "The sensible purpose of this rule is to permit a judge already familiar with the facts of one case to preside over both cases with a minimum duplication of judicial effort." *Id. at *1*.

With Rule 10(d)(1) in mind, the Government brings to the attention of the Court the fact that *United States v. Camacho*, 3:00CR215(AVC) has been assigned to this Court and that this prosecution involves claims and legal issues that are foursquare with claims and issues already considered by Judge Thompson.

2

The Government brings the foregoing information the Court's attention for whatever action it deems appropriate under the circumstances.

Respectfully submitted,

STEPHEN C. ROBINSON
UNITED STATES ATTORNEY

*[signature]*

JAMES I. GLASSER
ASSISTANT U.S. ATTORNEY
CT BAR No. CT07221
157 CHURCH STREET
NEW HAVEN, CT 06510
203-821-3800

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was forwarded to: Hon. Alvin W. Thompson, United States District Judge, United States District Court, 450 Main Street, Hartford, CT 06103 and Roger Sigal, Esq., Assistant Federal Public Defender, 2 Whitney Avenue, Suite 300, New Haven, CT 06510 on this 19th day of December 2000.

*[signature]*

JAMES I. GLASSER
ASSISTANT FEDERAL PUBLIC DEFENDER

3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

YOLANDA SANTIAGO           :      CIVIL ACTION NO.
          Plaintiff        :      3:00CV 2386 (SRU)(WIG)
                       :
VS.                        :
                       :
CITY OF HARTFORD;          :
HARTFORD POLICE DEPARTMENT; :
OFFICER JULIO CAMACHO      :
          Defendants       :      SEPTEMBER 17, 2003

## **AFFIDAVIT OF NEIL DRYFE**

The undersigned, having been duly sworn, deposes and says that:

1.     I am over the age of 18 years and understand and believe in the obligations of an oath. I have personal knowledge of the facts set forth herein.

2.     I have been a sworn member of the Hartford Police Department since February 1990 and currently hold the rank of Lieutenant.

3.     Since April 2002, I have held the position of Commanding Officer of the Internal Affairs Division. My responsibilities include the supervision of administrative and criminal investigations involving members of the Hartford Police Department.

4.     As the Commander of the Internal Affairs Division, I am responsible for receiving, evaluating, classifying and assigning complaints against employees of the Hartford Police Department, including sworn police officers.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

5.    Investigations conducted by the Internal Affairs Division can lead to the issuance of discipline, including suspension and termination, and/or the arrest and prosecution of members of the Hartford Police Department.

6.    The Hartford Police Department maintains a Complaint Log in which all complaints against Hartford police officers are listed.  The Complaint Log identifies the IAD case number, a description of the allegation, the identity of the citizen complainant, and the final disposition of the investigation.

7.    At the request of Attorney Brian Leaming, I have identified and reviewed to the best of my ability the Internal Affairs investigations which involve allegations of sexual assault or misconduct by Hartford police officers between January 1993 through December 1998.  In a few cases where I could not locate a file from archives, I contacted the investigating officers that were identified in the Complaint Log.

8.    The Complaint Log identified fourteen (14) allegations of some type of sexual misconduct from January 1993 through December 1998.   Nine of the incidents involved an officer's off-duty conduct.  Each allegation was investigated by either the Internal Affairs, Major Crimes, or Youth Services Divisions.

9.    One of the complaints ("I-94-6") involved former Hartford police officer Julio Camacho.  The nature of this complaint can be summarized as follows:  At approximately 2:00 a.m. on January 26, 1994, Officer Camacho responded to a report of

- 2 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

a residential burglary.  The complainant alleged that while Officer Camacho was conducting his investigation he forced himself on her, kissing her twice and touching her breasts.  On January 31, 1994, a Sergeant in the Internal Affairs Division was assigned to conduct an investigation.  During the course of the investigation, the investigator was unable to corroborate the allegations made by the complainant.  The following factors were identified by the investigator.  First, the complainant had an odor of marijuana on her each time she was interviewed calling into question whether she was in an impaired state of mind during the incident and subsequent interviews.  Second, that the complainant may be suffering from a mental illness based on past admittance to the hospital for psychiatric treatment and reports of suicide attempts.  Third, the complainant lied to her employer regarding the investigation.  Fourth, when interviewed, the complainant appeared confused and would alter her account of the incident each time she related it to the investigator.  As a result, the investigation was closed as Unfounded.

10.    The other allegations can be summarized as follows.  One complaint involved an allegation that a police officer coerced a prostitute into engaging in sexual activity under threat of arrest.  The complaint was assigned to Internal Affairs to investigate.  The complainant, however, refused to cooperate with the investigation, and, in fact, refused to talk with the Internal Affairs Investigator.  The investigation was

- 3 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

therefore closed without criminal or disciplinary action taken. Of the remaining twelve investigations, six resulted in the officer being arrested and charged with one or more criminal offenses. In one of the remaining six investigations which did not result in an arrest, the complainant could not identify the perpetrator who she believed to be a police officer, although the alleged perpetrator was not in uniform. Another of the complaints was investigated and closed as Unfounded when the complainant changed her testimony. Another investigation did not involve criminal conduct, but the officer was charged with Conduct Unbecoming an Officer for attempting to initiate a sexual relationship with a high school student. The officer resigned before any disciplinary action could be taken. One of the other investigations involved two off-duty Hartford police officers who engaged in consensual sexual activity in a public place. Both officers were disciplined for Conduct Unbecoming an Officer. Of the final two investigations, one was Not Sustained based on the evidence obtained, and the other was closed administratively when the alleged victim denied any sexual relationship with the officer.

Neil Dryfe

- 4 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

Sworn and subscribed to on this 17th day of September, 2003.

_____
Commissioner of the Superior Court

460102.1(HS-FP)

- 5 -

One Goodwin Square                    HALLORAN                Phone (860) 522-6103
225 Asylum Street                     & SAGE LLP               Fax (860) 548-0006
Hartford, CT 06103                                            Juris No. 26105