UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------x
YOLANDA SANTIAGO,                              :
                                               :
       Plaintiff,                              :     CIVIL ACTION NO.
   v.                                          :     3:00CV2386 (WIG)
                                               :
CITY OF HARTFORD;                              :
HARTFORD POLICE DEPARTMENT;                    :
OFFICER JULIO CAMACHO                          :
                                               :
       Defendants.                             :
---------------------------------------------------------x

**RULING ON DEFENDANTS CITY OF HARTFORD AND HARTFORD POLICE DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT**

      Currently pending is defendants City of Hartford ("COH") and Hartford Police Department's ("HPD") motion for summary judgment. (Doc. #32). This case arises out of an alleged sexual assault on plaintiff, Yolanda Santiago, by defendant Julio Camacho while Camacho was working as a City of Hartford police officer. While defendants dispute the veracity of plaintiff's allegations against Officer Camacho, they argue that Ms. Santiago's allegations, even if true, fail to state a cognizable claim under 42 U.S.C. § 1983.

      Based upon the Local Rule 56 statements, exhibits and deposition testimony submitted in conjunction with the defendants' motion for summary judgment and the plaintiff's opposition thereto, the Court finds the following facts to be undisputed for the purposes of this ruling. All disputed facts are construed in the light most favorable to the plaintiff.

      Yolanda Santiago alleges that, in December 1997, Officer Camacho stopped her as

she exited a store in the Albany Avenue area of Hartford, accused her of making a narcotics sale, ordered her into his vehicle and took her to a secluded location where he sexually assaulted her. (Compl. p. 3, lines 11-14).  Before, Camacho assaulted her, Camacho allegedly gave her the choice of consenting to the sexual contact or face arrest.(Santiago Dep. 58, Line 4).  Ms. Santiago testified she was scared and involuntarily consented to sexual contact.  (Santiago Dep. 81, Lines 20- 24; Dep. 82, Line 1).

      During the assault, Camacho spoke to Ms. Santiago in Spanish and English and told Ms. Santiago that he was Puerto Rican. (Exhibit G, p. 3).  After he completed the assault, Camacho drove Ms. Santiago, who was seated in the back of his police cruiser, to a nearby street and allowed Ms. Santiago to exit his vehicle.  While driving away, Officer Camacho remarked to Ms. Santiago that he would "see her again."  Ms. Santiago construed this remark as a tacit threat against her should she speak out. (Exhibit G, p. 3).  Ms. Santiago was not able to discern Camacho's name, badge number or cruiser number.  The only identifying information she knew about Camacho at the time of the assault was that he frequently worked in the Albany Avenue area.  (Exhibit G, p. 4).  Because Ms. Santiago was fearful of reprisals by Camacho, she did not immediately report the incident. (Compl. p. 4, Line 24).

      Defendants attempt to impeach Ms. Santiago's credibility by highlighting the fact that on two occasions she has offered different accounts of when and how she ultimately came to report the assault to the HPD.  It is undisputed that in her deposition, Ms. Santiago testified that she reported the assault in and around February or March 1998, approximately two months after the assault.  During her deposition, Ms. Santiago testified that she telephoned the HPD and told a HPD dispatcher that she had been raped by a Hartford police

officer. (Santiago Dep. 89, Lines 14-16). When the dispatcher asked Ms. Santiago the name of the police officer that had raped her, she told the dispatcher she did not know the officer's name. Ms. Santiago testified that the dispatcher then told her that the HPD could not help her and then abruptly hung up the telephone on her. (Santiago Dep. 90, Lines 1, 15, 16, 21-24; Dep. 91, Line 1; Dep. 92, Lines 6-10).

On October 13, 2000, Ms. Santiago recounted a different version of events while speaking to agents from the Federal Bureau of Investigation ("FBI") who were investigating allegations of sexual misconduct by HPD officers. At that October 2000 meeting, Ms. Santiago stated that she first reported the assault - not one to two months afterward - but twenty-two months afterward, in or around October of 1999. At the October 2000 meeting with the FBI, Ms. Santiago stated that she reported the assault after viewing a television news story about Hartford police officers being arrested for having sex with prostitutes. Ms. Santiago told the FBI that she called the HPD and spoke with a dispatcher. She recounted that she told the dispatcher that one of the male officers she had seen on television was the officer who had raped her. The dispatcher, who was female, asked if Ms. Santiago knew the officer's name. When Ms. Santiago replied that she did not know the name of the officer, the dispatcher allegedly asked Ms. Santiago, "what do you want us to do about it?" Ms. Santiago told the FBI agents that she ended the conversation with the police dispatcher. (FBI Report: Exhibit G, p. 3). Ms. Santiago explains this apparent inconsistency in her statements by alleging that her telephone call in October 1999 was the second time she had called the HPD to report the assault. (Compl. p. 5, Line 28).

It is undisputed that the HPD first provided Ms. Santiago with the opportunity to make a positive identification of Camacho during the October 13, 2000 FBI interview. At

that time, she was shown an array of photographs of eight Hispanic males and she selected what she believed was a photograph of Officer Camacho. She informed the FBI that the person depicted in that photograph was the person that sexually assaulted her. (FBI Report: Exhibit G, p. 4). Neither party has established for the Court whether the photograph selected by Ms. Santiago was actually a photograph of Officer Camacho.

### The City of Hartford's Record of Investigating Allegations of Sexual Misconduct by Police Officers and Disciplining Officers

It is undisputed that in the Summer of 1998, several female citizens of Hartford came forward with allegations that HPD officers had sexually assaulted them. These revelations launched a state and federal probe that culminated in the prosecution and the incarceration of HPD officers. The unearthing of the sexual misconduct allegations began when HPD officers Sergeant Franco Sanzo and Detective Terry Blair's arrested Stacy Richard for prostitution on August 5, 1998. While in custody, Ms. Richard told Sanzo and Blair that two officers of the HPD had coerced her into performing sexual acts and that other prostitutes may have been coerced into performing sexual acts. (Exhibit E: Affidavit of Sanzo, Line 4).

Sergeant Sanzo and Detective Blair immediately reported Ms. Richard's allegations to Lieutenant Kenary, the Commander of the Vice and Narcotics Division. Thereafter, Sergeant John Betz of the Internal Affairs Division became involved in the investigation. (Exhibit E: Affidavit Sanzo, Line 5). Either the day of Ms. Richard's arrest or the following day, Sergeants Sanzo and Betz informed Joseph Croughwell, the then Chief of Police for the City of Hartford, of Ms. Richard's undisputedly explosive allegations. Mr. Croughwell authorized Sergeant Betz to continue his investigation into Ms. Richard's complaint.

(Exhibit F: Affidavit of Croughwell, Line 3).  Mr. Croughwell had reservations about whether the Internal Affairs Division could manage an investigation of this scope and he decided that the Intelligence Division would be better suited to the task.  Mr. Croughwell transferred Sergeant Betz to the Intelligence Division and Detective Blair was later assigned to assist with the investigation. (Exhibit F: Affidavit of Croughwell, Line 4).

Mr. Croughwell also contacted John Bailey, then Chief State's Attorney for the State of Connecticut, to discuss State assistance with the investigation.  In a meeting with Hartford State's Attorney Jim Thomas and the then United States Attorney, Stephen Robinson, U.S. Attorney Robinson offered the assistance of his office and the FBI.  Mr. Croughwell accepted the offer of assistance and informed Robinson that he had discussed with Chief State's Attorney Bailey the possibility of empaneling a State Grand Jury to consider criminal charges.  The various agency representatives agreed to create a joint law enforcement task force comprised of the U.S. Attorney's Office, the FBI, the Chief State's Attorney's Office and the Hartford Police Department. ("Task Force")  (Exhibit F: Affidavit of Croughwell, Line 5-6).

The U.S. Attorney's Office became the lead prosecuting agency, and the FBI became the lead-investigating agency.  A federal grand jury was empaneled and the information derived from the grand jury and Task Force Investigation was subject to the grand jury secrecy rules and has not been provided to this Court. (Exhibit F: Affidavit of Croughwell, Line 7).

It is undisputed that Stacy Richard's allegations in August 1998 that HPD officers were engaged in sexual misconduct were not the first complaints of sexual misconduct levied against HPD officers.  The HPD had encountered these types of complaints before,

and it maintained a Complaint Log regarding claims made against HPD officer. In support of its motion for summary judgment, the HPD submitted a purportedly complete list of its Complaint Log that identified fourteen (14) allegations of varying degrees of sexual misconduct by Hartford Police officers between January 1993 and December 1998. (Exhibit C: Affidavit of Neil Drye, Lines 6, 8).

     Most pertinent to this case is a complaint of sexual misconduct against the defendant, Officer Camacho. In Complaint 1-94-6, a woman alleged Officer Camacho kissed her twice and touched her breasts. According to defendants, a sergeant in the Internal Affairs Division investigated the allegations and failed to corroborate them. The sergeant closed the case against Camacho citing four reasons: (1) the complainant seemed to smell of marijuana each time she was interviewed, calling into question her state of mind at time of the incidents and subsequent interviews; (2) the complainant may have been suffering from a mental illness; (3) the complainant lied to her employer regarding the investigation; and (4) the complainant appeared confused and would alter her account of the incident each time she was questioned. (Exhibit C: Affidavit of Neil Drye, Line 9).

     Another compliant involved an allegation that another police officer coerced a prostitute into engaging in sexual activity under threat of arrest. A representative from the Internal Affairs Division investigated this allegation but the complainant refused to cooperate with the investigation, and refused to talk with the Internal Affairs investigator. Internal Affairs closed the investigation before any criminal or disciplinary action. (Exhibit C: Affidavit of Neil Drye, Line 10).

     Of the remaining twelve investigations of sexual misconduct, six resulted in an officer being arrested and charged with one or more criminal offenses. Six complaints of

sexual misconduct by HPD officers did not result in criminal charges and were internally investigated and concluded as follows: (Case 1) complaint was closed when the complainant could not identify the perpetrator whom she believed to be a police officer, although the alleged perpetrator was not in uniform; (Case 2) the complaint was investigated and closed as unfounded when the complainant changed her testimony; (Case 3) the complaint resulted in the officer being charged with Conduct Unbecoming an Officer for attempting to initiate a sexual relationship with a high school student. The officer resigned before any disciplinary action could be taken; (Case 4) the complaint resulted in officer(s) being charged with Conduct Unbecoming an Officer for engaging in consensual sexual activity in a public place while off-duty; (Case 5) the complaint was not sustained based on the evidence obtained; and (Case 6) the complaint was closed when the alleged victim denied any sexual relationship with the officer. (Exhibit C: Affidavit of Neil Drye, Line 10).

This evidence regarding the HPD complaint log is the only evidence in the record before this Court regarding the HPD's policies and procedures for preventing and disciplining sexual misconduct by its officers. In support of its motion for summary judgment, the COH and the HPD did not proffer evidence regarding their training of dispatch personnel to handle citizen complaints against unnamed officers. The defendants did not proffer any written policies designed to prevent sexual harassment and misconduct by officers. The defendants did not proffer any written policies regarding disciplining of police officers for sexual harassment and misconduct. The defendants did not proffer any written policies regarding training of police officers in the proper reporting of sexual harassment and misconduct by fellow officers.

### SUMMARY JUDGMENT STANDARD

A court may grant summary judgment only if it determines that there is no genuine issue of material fact based on a review of the pleadings, deposition, answers to interrogatories, admissions on file, and affidavits. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The court must also construe the facts in a light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, "mere conclusory allegations or denials" in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2nd Cir. 1978).

## DISCUSSION

### The Plaintiff has not Established that the Hartford Police Department is a Separate Entity from the City of Hartford for Purposes of Section 1983

The City of Hartford asserts that "[m]unicipal departments are not considered distinct corporate entities, and, therefore are not considered 'persons' under 42 U.S.C. §1983." (Def. Mem. In Supp. Summ. J., p. 5). The plaintiff has not objected to the City's motion on this point and has not proffered any legal or logical argument as to why this portion of the City's motion should not be granted. Therefore, the defendants' motion on

this count is granted and the Hartford Police Department will no longer be a defendant in this action.[1]

### **The Plaintiff has not Properly Alleged a Vicarious Liability Claim Under Connecticut General Statute § 7-465**

The remaining defendant, COH, claims that since the plaintiff failed in her procedural requirements under Connecticut General Statute §7-465, her claim under Section 7-465 should be dismissed. The COH asserts that the burden is on the plaintiff to prove compliance. "To establish the liability of the municipality under §7-465, a plaintiff must prove compliance with the requirements of this statute as to demand and notice." *Bartucca v. City of Bristol,* 23 Conn. Supp. 228, 229 (Superior Court of Connecticut 1962). "The Statute requires the plaintiffs to provide notice of the intention to sue the municipality, specifying intention to sue the municipality, specifying the time and location of the accident, with the clerk of the municipality within six months of the accrual of the cause of action." *Santiago v. City of New Britain,* Conn. Supp. 22, 23 (Conn. Super. Ct. 1991).

Once again, the plaintiff has not objected to the COH's motion for summary judgment on this count, and the COH's motion is granted as to the fourth count.

### **A Municipality May be Liable for the Unconstitutional Actions of its Employees if It was Deliberately Indifferent to the Risk of Harm to its Citizens**

The overarching issue in this case is whether the City of Hartford can be held liable for the sexual misconduct of Officer Camacho under a *Monell* theory in the absence of an express policy authorizing or condoning Camacho's alleged misconduct. The central issues

---

[1] Since the HPD's motion for summary judgment is granted at this point, the Court will hereafter refer only to the sole remaining defendant, City of Hartford, and use the singular "defendant".

in a trial on this claim would be whether the City of Hartford had in place appropriate training and policies for its officers and dispatch personnel to address the risk of sexual misconduct by HPD personnel. While the City of Hartford cannot be held liable for unconstitutional conduct of its employees under a *respondeat superior* theory, it may be held liable for a harm caused by its policies and customary practices.

In *Monell v. Department of Social Services,* the Supreme Court first ruled "that Congress did intend municipalities and other local government units to be included among those persons to whom §1983 applies." *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). The Court rejected a *respondeat superior* theory of liability, but rather "conclude[d], ...that a local government may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978)(emphasis not original).

Since *Monell*, the Supreme Court has endeavored keep the line between municipal accountability for its policy makers' misdeed and outright *respondeat superior* liability in tact. In *Oklahoma City v. Tuttle*, the Court held that "to impose liability under *Monell*…considerably more proof then the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Oklahoma City v. Tuttle,* 471 U.S. 808, 824 (1985). The Court reasoned that to premise a *Monell* failure to train claim on a single incident could unduly threaten a municipality's immunity from respondeat superior

liability. *Walker,* 974 F.2d at 296. As is common in complex areas of the law, the holding of *Oklahoma City v. Tuttle* that a *Monell* claim requires "more proof then the single incident" is not without its exceptions. In *Pembaur v. Cincinnati,* the Court held that a single decision could represent "official policy" when it is adopted by the authorized decision-makers. "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. Cincinnati,* 475 U.S. 469, 480 (1986). The *Pembaur* Court recognized that "official policy" need not always refer to a formal set of written rules. "'Official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Id.* at 480-481. Justice O'Connor stated in *St Louis v. Praprotnik*, that "identification of policymaking is a question of state law." *St Louis v. Praprotnik,* 485 U.S. 112, 142 (1988). "In sum, *Tuttle* and *Pembaur* require plaintiffs to allege actual conduct by a municipal policymaker. *Praprotnik* insures that only actions by officials relatively high up in the municipal hierarchy will produce municipal liability. The combination of the three cases molds many §1983 claims against municipalities into 'failure to train' or 'failure to supervise' claims. It is only by casting claims in this way that plaintiffs can link an actual decision by a high level municipal official to the challenged incident." *Walker,* 974 F.2d. at 296-297.

### **Municipality Liability under *Monell* in the Absence of an Express Policy Sanctioning Constitutional Violations**

A municipal policy or custom may arise from a municipal decision maker's indifference. In *City of Canton v. Harris*, the Supreme Court held that "the inadequacy of

police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S.378, 388 (1989).   The Court reasoned that "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under §1983."  Additionally, in *City of Canton,* the Court stated that "only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality-a 'policy' as defined by our prior cases-can a city be liable for such a failure under §1983."  *Id.* at 389. The Court noted that "the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *Id.* at 390.

In this case, Ms. Santiago must show the COH failed to adequately train its employees to prevent and report and redress sexual misconduct by its police officers.  Facts relevant to this inquiry will center on the COH's training of its dispatchers to deal with allegations of sexual misconduct, policies aimed at preventing abuse by its officers and other employees, and the investigation and disciplining of sexual misconduct.

### The City of Hartford's Duty To Train Its Police Officers Not To Commit Sexual Assault

The City of Hartford has proffered no facts relating to its training of its police officers regarding the importance of refraining from sexual misconduct.  It also has not proffered any evidence relating to its training of dispatch personnel to properly handle allegations of sexual misconduct reported by the public.  However, a lapse in personnel training does not necessarily give rise to *Monell* liability.  As a general principal,

municipalities are not required to provide training to their employees regarding the need to avoid *mala in se* acts, such as sexual assault.

In *Walker v. City of New York*, the Second Circuit faced the question of whether a municipality could be held liable for its failure to train its employees not to contravene a bedrock principal of our judicial system - the need to refrain from false testimony in a criminal trial. The plaintiff in *Walker* brought a *Monell* claim against New York City alleging that perjurious testimony by NYPD officers resulted in his wrongful criminal conviction and the ensuing nineteen years of wrongful imprisonment. Mr. Walker also alleged prosecutors' failure to disclose exculpatory evidence. The District Court granted the City's motion to dismiss and the Second Circuit reversed and remanded to permit additional discovery on Walker's *Monell* claims. *Walker,* 974 F.2d. at 294. The Second Circuit explained:

> "Where the proper response—to follow one's oath, not to commit the crime of perjury, and to avoid prosecuting the innocent—is obvious to all without out training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise. That general rule, however, does not apply in every case. While it is reasonable for city policymakers to assume their employees possess common sense, where there is a history of conduct rendering this assumption untenable, city policymakers may display deliberate indifference by doing so. If [the plaintiff] can produce some evidence that policymakers were aware of a pattern of perjury by police officers but failed to institute appropriate training or supervision, his claim can survive summary judgment." *Walker,* 974 F.2d.at 299-300.

The *Walker* Court set forth "…three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens. First, the plaintiff must show that a policymaker knows 'to a moral certainty' that employees will confront a given situation. Second, the plaintiff must

show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. A choice might also be difficult where, although the proper course is clear, the employee has powerful incentives to make the wrong choice. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 297-298.

The Court in *Walker* held that "where the plaintiff establishes all three elements, then we think it can be said with confidence that the policymaker should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Walker,* 974 F.2d. at 298, quoting *City of Canton,* 489 U.S. at 390.

The Second Circuit has also found municipalities may be found to have acted with deliberate indifference for their failure to train and supervise municipal employees of their obligation not to harass a co-worker for exercising his first amendment rights and failure to train officers to refrain from the use excessive force after repeated complaints of civil rights violations demonstrated an obvious need for training. *Jeffes v. Barnes,* 208 F.3d 49, 51-52 (2nd Cir. 2000); *Vann v. City of New York,* F.3d 1040, 1050 (2nd Cir. 1995). The *Vann* court found that a municipality's track record of abdicating its responsibility to properly supervise its police officers was sufficient to overcome the presumption that ordinary decent officers do not require training to refrain from using excessive force. *Id* at 151.

The Eighth Circuit considered a deliberate indifference claim arising out of police sexual misconduct in *Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987). In *Harris*, a police officer sexually assaulted a woman after falsely arresting her. The plaintiff alleged

the City was liable under a Section 1983 because before the assault municipal officials had been deliberately indifferent to citizen complaints of physical and sexual misconduct by the defendant police officer and other police officers. The jury returned a verdict in favor of the plaintiff against both the officer and the City and the Eighth Circuit affirmed.  The Eighth Circuit concluded that, "the evidence in this case clearly establishes that there was a pattern of sexual misconduct by the City police officers, especially [the defendant officer], that on repeated occasions City officials in positions of authority and responsibility were notified of the offensive acts, but that upon receiving such notice, these City officials repeatedly failed to take any remedial action. We conclude this amounts to deliberate indifference to police abuses. Thus, we hold that [the plaintiff] has proved the existence of municipal custom sufficient to support municipal liability under §1983." *Id.* at 506.  The *Harris* Court found the City had a "long-standing evasion of a problem of persistent sexual misconduct by police officers." *Harris,* 821 F.2d at 508.

In *Andrews v. Fowler,* the Eighth Circuit again undertook an analysis of *Monell* liability arising out of an officer's sexual misconduct. *Andrews v. Fowler,* 98 F.3d 1069 (8th Cir. 1996).  In *Andrews,* a woman, who had been raped by a police officer, brought action against the officer, the city, a former police chief, and the mayor.  The Eighth Circuit affirmed the District Court's granting of summary judgment to the defendants because it found "strong evidence that the city had a policy or custom of taking adequate remedial action to remove police officers accused of sexual misconduct." *Id.* at 1075.  In deciding the dismissal was appropriate, the Eighth Circuit highlighted steps taken by the chief of police to rectify earlier misconduct by the officer.  The Eighth Circuit also noted that none of the pre-assault allegations against Fowler alleged conduct as grievous as sexual assault but

instead alleged inappropriate remarks and the officer's relationship with a minor. The Eighth Circuit took special note of the fact that on the very night of the assault Fowler was directly admonished not to fraternize with minor females. *Id.*

The *Andrews* court found the city could not be found to be liable under a *Monell* theory of negligent hiring or training because there existed no patently obvious need to train officers not to commit rape, and, even assuming training was somehow deficient, the failure to train did not cause the rape. The Court reasoned that the deficiency in training had to have a causal connection to the officer's actions. *Id.* at 1076. The *Andrews* Court further concluded that in order for the plaintiff to establish a claim based upon deficient training policies, the plaintiff must first show that the city had notice of inadequate procedures or policies and that the inadequate procedures or policies were likely to result in violation of constitutional rights. *Id.* at 1076.

The Second Circuit's jurisprudence, as established in *Walker, Jeffes,* and *Vann*, instructs that where the need to refrain from injurious conduct would appear obvious to most people, such that training would not be needed, a municipality may be found liable for wrongful conduct of its employees if the municipality has notice that its employees are deviating their expected standard of conduct. In this case, it is undisputed that two of *Walkers* three requirements are met by Ms. Santiago. As was set forth above, to satisfy *Walker's* three prongs, Ms. Santiago must establish that: 1) that the COH knew 'to a moral certainty' that its employees would confront a situation where sexual misconduct was possible; 2) that that situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.; and 3) that the wrong choice by the employee to engage in sexual

misconduct will cause the deprivation of a citizen's constitutional rights.

It is undisputed that the first and third prongs of the *Walker* test are met by Ms. Santiago. In this case, the City of Hartford policymakers knew 'to a moral certainty' that their officers would confront opportunities to engage in sexual misconduct because it had happened in the past, as evidenced by the Complaint Log. It is also undisputed that Officer Camacho's alleged choice - to sexually assault Ms. Santiago - if true, caused a deprivation of her constitutional rights. The remaining prong that Ms. Santiago must show to forestall summary judgment is that training or supervision would reduced the likelihood that Officer Camacho would choose to assault her; or that the City had a history of employees mishandling the situations where they had an opportunity to sexually assault a citizen.

Unfortunately, the COH did not provide this court with any evidence regarding its policies for training officers to avoid sexual misconduct or its policies for disciplining sexual misconduct. The only insights provided this Court into the COH's policies on sexual misconduct are the scant two page overview of the investigation and resolution fourteen formal complaints of misconduct filed against officers. Obviously, there is a strong argument to be made that a decent police officer does not need to be trained or instructed not to solicit sex from a citizen in exchange for not arresting her. However, the lack of any evidence about how these issues were addressed within the HPD may raise questions about whether rogue officers like Camacho felt they could prey upon women with impunity.

Moreover, the alleged mishandling of Ms. Santiago's alleged reports of the assault to the HPD may be probative of whether the HPD had a culture of indifference to allegations of sexual assault and consequently failed to vigorously investigate her complaint. That Ms. Santiago's report to the HPD was, by necessity, made post-assault does not obviate its

relevance. In *Bordanaro v. Mcleod, City of Everett*, the First Circuit held that "[p]ost-event evidence can shed some light on what policies existed in the city on that date of an alleged deprivation of constitutional right". *Bordanaro v. Mcleod, City of Everett,* 871 F.2d 1151, 1167 (1st Cir. 1989).

If a jury credited Ms. Santiago's allegation that she made the first complaint in 1998 only to be summarily rebuffed by the dispatcher, then the jury could find that Officer Camacho's misconduct might have been disclosed earlier. Although Ms. Santiago admittedly was unable to provide the dispatcher with her assailant's name and badge number, she could have provided some descriptive information had the dispatcher bothered to ask. Ms. Santiago knew her assailant was frequently assigned to patrol Albany Avenue and that he claimed Puerto Rican descent. These two pieces of information could have provided a basis for an internal affairs officer to create a narrowed and manageable list of possible suspects for Ms. Santiago to review. "It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city may be held liable if it actually causes injury." *City of Canton,* 489 U.S. at 390.

If the City of Hartford had a laissez-faire policy regarding the disciplining and investigation of sexual misconduct such that some officers construed it as license to engage in misconduct, a jury might find that the COH's failure to establish policies regarding sexual

misconduct amounted to deliberate indifference to the rights of people like Ms. Santiago. Since the COH's policies had have not been established on this record they are reserved as questions of fact to be determined by a jury.

## CONCLUSION

The Defendants' motion for summary judgment (Doc. #32) is **GRANTED in part and DENIED in part.** The Defendant City of Hartford's motion for summary judgment as to **COUNT FOUR IS GRANTED** and as to **COUNT FIVE IS DENIED**. The Hartford Police Department's motion for summary judgment is granted. The plaintiff's motion for extension of time, (Doc. #42) is **GRANTED**.

The clerk is directed to terminate the Hartford Police Department as a party. The parties are directed to contact the chambers of the undersigned on **August 26, 2004 at 1:00 p.m.** regarding scheduling this case for trial. Plaintiff's counsel shall initiate the telephone call to (203) 579-5593 with all parties on the line.

SO ORDERED this 2nd day of August, 2004, at Bridgeport, Connecticut.

/S/ *William I. Garfinkel*
William I. Garfinkel
United States Magistrate Judge