established constitutional right. Members of the public do not have a Fourteenth Amendment right to sue police officers who fail to protect them from harm inflicted by third parties.[9]

In sum, the Court's reliance upon Santiago's story is misplaced. That incident allegedly occurred after the assault. It is irrelevant whether Camacho could have been investigated and/or prosecuted sooner. The delay, if any, is speculative. More importantly, any delay did not result from a policy or custom implemented by a Hartford policymaker. Nor did the delay, if any, amount to a violation of a clearly established constitutional right.

The Court's reliance upon Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989) is also misplaced. It cited Bordanaro in support of its belief that Santiago's telephone operator story was probative even though it occurred after the alleged assault. (8/2/04 Ruling, at 17-18) With regard to the admission of post-event evidence, Bordanaro concluded that it was not reversible error for the district court to admit post-event evidence of the lack of an improper internal investigation of the attack at issue and the failure to take strong disciplinary action against the officers involved. Bordanaro, 871 F.2d at 1166.[10] In doing so, the court relied upon Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985) and Praprotnik.

In Grandstaff, the Fifth Circuit held that a *policymaker's* disposition after the date of the incident was evidence of his disposition prior to the date of the incident. 767 F.2d at 171. Thus, it concluded that the subsequent acceptance of dangerous recklessness by a *policymaker* tended

---

[9] See Deshaney v. Winnebago County Dep't. of Soc. Servs., 489 U.S. 189, 196 (1998); Raynor v. City of Longview, 1997 WL 312557, at *1 n.1 (9th Cir. June 3, 1997) (affirming summary judgment on claim that city and county failed to property train 911 dispatchers to respond to civil disputes); Frane v. Kijowski, 992 F. Supp. 985, 995 (N.D. Ill. 1998) (plaintiffs produced no evidence of dispatcher committing a constitutional violation).

[10] In Bordanaro, the First Circuit recognized that in order to show that city officials had constructive knowledge of the practice at issue; a plaintiff must show that "the practices have been so widespread or flagrant that in the proper exercise of their official responsibilities the municipal *policymakers* should have known of them." 871 F.2d at 1157 (emphasis added).

21

to prove his pre-existing disposition in policy. Id. Specifically, Grandstaff emphasized that the police chief's failure to make changes in practice in the aftermath of the incident at issue allowed an inference that the officer's actions were the way things were done and have been done in the city and thus reflected city policy.[11]

Thus, the post-event evidence that Bordanaro believed could shed light on what policies existed involved conduct on the part of municipal *policymakers*, as only they could create a policy or custom and thereby trigger municipal liability. In the instant case, the alleged conduct of the unidentified telephone operator is irrelevant. This is particularly so given the fact that there is neither an allegation nor evidence that any Hartford policymaker had notice of Santiago's alleged initial attempt to report the alleged assault. Nor is there any evidence that the telephone operator was a Hartford policymaker. Accordingly, Santiago's story provides no support for her Monell claim and the court should enter summary judgment in favor of Hartford.

**F.    The Investigations By The HPD In Response To Citizens' Complaints Requires The Entry Of Summary Judgment In Favor Of Hartford**

In addition to the foregoing, the failure in Santiago's proof and her admissions in her Local Rule 56(a)2 Statement also required the entry of summary judgment on her failure to supervise/discipline claim, under the specific case law analyzing such claims. In a case involving the alleged existence of a municipality's custom of failing to punish sexual misconduct on the part of police officers, courts have held that a plaintiff is required to prove:

> (1) the existence of a continuing, widespread, persistent pattern of
> unconstitutional misconduct by the governmental entity's employees; (2)
> deliberate indifference to or tacit authorization of such conduct by the
> governmental entity's policymaking officials after notice to the officials of
> that misconduct; and (3) that plaintiff was injured by acts pursuant to the

---

[11]/    Bordanaro also believed that Praprotnik supported the admission of the post-event evidence. Specifically, it noted that in Praprotnik, a plurality of the Justices determined that to be actionable under § 1983, municipal policy or custom must have been adopted or acquiesced in by an actor with final policy making authority. Bordanaro, 871 F.2d at 1166.

governmental entity's custom, i.e., that the custom was a moving force
behind the constitutional violation.

Mettler v. Witledge, 165 F.3d 1197, 1204 (8th Cir. 1999); Jones v. Ziegler, 894 F. Supp. 880,

890 (D. Md. 1995), aff'd 104 F.3d 620 (4th Cir. 1997). "'Deliberate indifference' . . . 'is

determined by analyzing whether the municipality knew or should have known of the risk of

constitutional violations,' but did not act." Warren v. District of Columbia, 353 F.3d 36, 39

(D.C. Cir. 2004). Although this is an objective standard, it involves more than mere negligence.

"It does *not* require the City to take reasonable care to discover and prevent constitutional

violations. It simply means that, faced with actual or constructive knowledge that its agents will

probably violate constitutional rights, the City may not adopt a policy of inaction." Id. (emphasis

original).

    If a police chief or other policymaker throws a citizen's complaint into a waste paper

basket or tells the office of investigations to pay no attention to the complaints, a jury might infer

deliberate indifference. Wilson v. City of Chicago, 6 F.3d 1233, 1240 (7th Cir. 1993)(Posner,

C.J.). See Jones, 894 F. Supp. at 891. However, where a police chief refers complaints to the

unit within the police department that is responsible for investigating alleged police abuses, there

can be no basis for an inference of deliberate indifference. See Wilson, 6 F.3d at 1240. This

conclusion is true regardless of whether or not the plaintiff or court disagrees with the ultimate

determination of an investigation or with the speed in which that investigation occurs. Id.

Moreover, shortcomings in investigations do not demonstrate a "continuing, widespread, or

persistent pattern of misconduct." Mettler, 165 F.3d at 1205. See id. (affirming summary

judgment because plaintiff produced no evidence that previous investigations were inadequate or

that such investigations were a moving force in the constitutional violation).

    "[C]lose ex-post scrutiny of municipal decision making is an exercise ... the federal

courts are ill-suited to undertake." Jones 894 F. Supp. at 892. See City of Canton, 489 U.S. at

23

392. The final result of an investigation or the severity with which an officer is disciplined might be second guessed at a later point in time; but they cannot constitute the deliberate indifference necessary to establish municipal liability. Jones, 894 F.Supp at 892. The fact that the police department does not investigate the complaint as quickly or as effectively as a plaintiff or a court might, in hindsight, have liked, is irrelevant. Wilson, 6 F.3d at 1240. It certainly does not amount to deliberate indifference. Id. More is needed to show that a policymaker "approved the practice" being investigated. Id. Thus, "[f]ailing to eliminate a practice cannot be equated to approving it. Otherwise every inept police chief in the country would be deemed to approve, and therefore become answerable in damages to all the victims of, the misconduct of the officers under his command – indeed might (contrary to Deshaney v. Winnebago County Dep't. of Soc. Servs., 489 U.S. 189 (1989)) be deemed responsible for all the murders and robberies that he had through his carelessness failed to prevent." Wilson, 6 F.3d at 1240.

Moreover, what cannot be overlooked is the fact that the filing of a complaint by a citizen does not automatically call for the discipline of a police officer. Stengel v. City of Hartford, 652 F. Supp. 572, 574 (D. Conn. 1987). Consequently, a plaintiff must establish with specificity any alleged inadequacies in an investigation. Id. Moreover, the specifics of any single investigation do not constitute a persistent and widespread practice or custom by the municipality. See Jones, 894 F. Supp. at 891.

In the instant case, the undisputed evidence establishes that the commander of the HPD's Internal Affairs Division is responsible for receiving, evaluating, classifying and assigning complaints against police officers. (Ex. C, Dryfe Aff. ¶ 4) The evidence also establishes that the HPD investigates citizens' complaints against its officers. (Id. ¶¶ 3-10) Those investigations can result in an officer being disciplined, including suspension, termination and/or arrest. (Id. ¶ 5) It was *undisputed* that *all* of the fourteen complaints identified by the HPD, not all of which

24

involved alleged assaults, were investigated and discipline was imposed. (Hartford's & Pl.'s

Local R. 56(a) Statements, ¶¶ 14-15, 21; Dryfe Aff. ¶¶ 6-10; Ex. E, Sanzo Aff. ¶¶ 4-5; Ex. F,

Croughwell Aff. ¶¶ 3-8; Ex. G, 10/12/00 HPD Memo; 10/13/00 FBI 302 Report) That discipline

included the arrests of officers based on six of the complaints. (Hartford's & Pl.'s Local R. 56(a)

Statements, ¶¶ 21; Dryfe Aff. ¶ 10)

The undisputed evidence also demonstrates that in August 1998, in response to a

complaint by an arrestee that an officer coerced her into performing sexual acts, former Chief of

Police Joseph Croughwell ordered an investigation. (Croughwell Aff. ¶ 4) He also contacted the

Chief State's Attorney to seek assistance and to discuss possibly empanelling a Grand Jury. (Id.

¶ 5) Chief Croughwell also accepted the United States Attorney's offer of assistance from the

FBI. (Id.) When a joint task force was formed, Chief Croughwell assigned at least two sergeants

from the HPD to it. (Id. ¶ 8)

When Santiago called the HPD on October 12, 2000, it is undisputed that the HPD sought

to immediately dispatch investigators to interview her. (Hartford's & Pl.'s Local R. 56(a)

Statements, ¶ 11; Santiago Depo. Tr. 93) She refused to meet with them at that time. (Santiago

Depo. Tr. 93; Ex. G, 10/12/00 HPD Memo) An HPD sergeant and two FBI agents met with her

the next day. (Santiago Depo. Tr. 93; Ex. G. 10/13/00 FBI 302 Report)

The Court also overlooked the fact that Santiago "admitted" that all fourteen of the

complaints received by the HPD were "investigated." (Hartford's & Pl.'s Local R. 56

Statements, ¶¶ 14-15) She also admitted that the details behind the investigation into the one

previous complaint regarding Camacho were accurate and that the summaries of the other

thirteen investigations were correct. (Id. ¶¶ 16-21) In the face of Hartford's evidence and

Santiago's admissions, she cannot maintain a failure to supervise or discipline claim against

Hartford.[12]  There is no evidence of a widespread pattern/custom of acquiescence or complaints being disregarded.  In fact, because the HPD and Chief Croughwell did investigate complaints, there is no basis for finding deliberate indifference.  See Wilson, 6 F.3d at 1240.  Moreover, a Monell claim cannot be the vehicle to second guess the results of past police investigations and disciplinary decisions.  See Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989) (failure to discipline in specific instance cannot support Monell claim); Sarus, 831 F.3d at 401-02 (evidence of disciplinary proceedings against officers eliminates basis for finding system so deficient as to reflect policy of deliberate indifference).  Under no circumstances should such *post facto* analysis be undertaken by a jury in the face of no evidentiary showing by Santiago.

Finally, with regard to causation, even if the disciplinary policy employed by a police department encourages unconstitutional acts of individual officers, and even if the police chief creates a "climate in which [an individual officer feels] immune from the consequences" of his illegal acts, it would not constitute an affirmative cause of a plaintiff's injury.  Jones, 894 F. Supp. at 894.  Any alleged shortcomings in an investigation and disciplinary action could not be considered to be the "moving force" behind or "proximate cause" of a sexual assault.  Id.  The argument that if a particular officer or officers had been fired at an earlier point in time, a later sexual assault would not have occurred, does not satisfy the causation requirement for municipal liability under § 1983.  Id. at 895.  Such an argument is merely an attempt to apply an impermissible "but-for" test of causation.  Id. at 894.  The only way to impose liability on a municipality under these circumstances would be to find a "custom or practice of acquiescence by the municipal policy-maker in such rule-breaking . . . ."  Warner v. City of Terre Haute, 30

---

[12]/    See Mettler, 165 F.3d at 1205 (affirming summary judgment where plaintiff failed to offer any evidence that any previous investigations were inadequate or that such investigations caused the alleged constitutional violation); Thomas v. Roche, 165 F.3d 137, 145 (2d Cir. 1999) (affirming summary judgment based on plaintiff's failure to meet his burden regarding deliberate indifference in connection with investigation of civilian complaints).

F.Supp.2d 1107, 1121-22 (S.D. Ind. 1998). Accordingly, for a plaintiff to survive summary judgment on the issue of municipal liability, she would have to "***proffer sufficient evidence*** from which a reasonable fact-finder could discern either an unexpressed municipal policy, practice, or custom of acquiescence, or conduct by a person who has final policymaking authority with respect to actions taken against her." Id. at 1122 (emphasis added). Santiago produced no evidence to satisfy this standard.

### G.    The Case Law Relied Upon By The Court Supports The Granting Of Hartford's Summary Judgment Motion

A review of the decisions principally relied upon by the August 2 Ruling reveals that they in fact support the granting of Hartford's motion for summary judgment. (8/2/04 Ruling, at 13-16) In sum, the cases highlight, in dramatic fashion, the quantity and quality of the evidence that a plaintiff must produce in order to satisfy the rigorous standards that govern Monell claims. As it is undisputed that Santiago produced no evidence, summary judgment should be entered in favor of Hartford.

In Walker, with regard to the plaintiff's contention that the city's police department had an obligation to train and supervise officers not to commit perjury or aid in the prosecution of the innocent, the Second Circuit concluded that he had missed a "crucial step" in the analysis. 974 F.2d at 299. It recognized that

> [i]t is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens. . . City of Canton also requires a likelihood that the failure to train or supervise will result in the officer making the wrong decision. Where the proper response – to follow one's oath, not to commit the crime of perjury, and to avoid prosecuting the innocent – is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by City policymakers to the need to train or supervise.

Id. at 299-300.  Thus, the court concluded that when the employee's "misdeeds relate to such basic norms of human conduct – the duty not to lie or persecute the innocent - . . . in the ordinary case a municipal policymaker need not expend precious resources on training or supervision but can instead rely on the common sense of her employees." Id. at 301.

The Walker court acknowledged that the general rule might not apply in every case. Specifically it concluded that while it is reasonable for city policymakers to assume their employees possess common sense, where there is a history of conduct rendering this assumption untenable, city policymakers may display deliberate indifference by doing so. Id. at 300.  Thus, the court held that if the plaintiff could "produce some evidence that *policymakers* were aware of a pattern of perjury by police officers *but failed to institute appropriate training or supervision*, his claim [could] survive summary judgment." Id. at 300 (emphasis added).  Consequently, the court reversed the dismissal of the plaintiff's claim because it believed that he should be allowed to "pursue discovery...." Id.

As explained by Amnesty America, the key to Walker was the court's conclusion that the plaintiff should be given an opportunity to pursue discovery.  See supra, § A.  After discovery was completed, the Walker court expected the plaintiff to produce evidence that policymakers were aware of a pattern of misconduct but failed to institute appropriate training or supervision. 974 F.2d at 300.  Absent such evidence, the plaintiff could not survive summary judgment under the common sense rule. Id.

Here, discovery ended long ago.  Santiago has produced no evidence and has not disclosed an expert witness. (Ex. B., Pl.'s Resp. to Hartford's Interog. No. 10)  Accordingly, under Walker's reasoning Hartford is entitled to summary judgment under the common sense rule, i.e., it need not train its police officers not to sexually assault citizens.  See infra, § H.

In Jeffes v. Barnes, 208 F.3d 49 (2d Cir. 2000), correction officers who publicly criticized alleged assaults of county jail inmates by other officers and who assisted in a federal investigation brought a § 1983 action against a county and others, asserting First Amendment claims based on alleged retaliation. On appeal, the Second Circuit held that "the *evidence adduced by plaintiffs* suffices to present several triable issues as to the existence of a municipal policy causing retaliation against plaintiffs for their exercise of their First Amendment rights to speak of the April 29, 1994 incident of inmate abuse." Jeffes, 208 F.3d at 62 (emphasis added). Specifically, it also concluded that given the sheriff's autonomy with respect to jail operations, a major's testimony as to the daily adherence to the code of silence, and the other evidence that the sheriff himself embraced and enforced that code, a jury could permissibly find that the code of silence was a practice or custom that constituted the sheriff's and the municipality's standard operating procedure. Id. Moreover, there was ample evidence to permit a rational jury to find that the sheriff directly encouraged the acts of retaliation. Id. at 62-63. Thus, a jury would be entitled to infer that the sheriff's conduct was a direct cause of the harassment. Id. at 63.

The Jeffes court further found that given the evidence that the harassing and intimidating misconduct was open and notorious and was avowedly retaliatory against officers for exercising their First Amendment rights and assisting a governmental investigation to alleged wrongdoing, a jury could infer that the sheriff had deliberately not trained his staff to avoid infringing those rights notwithstanding that the need for such training was obvious. 208 F.3d at 63.[13] The court noted that in further support of that inference, there was evidence from the sheriff himself that in the past, when the concern was not the code of silence, he had taken prompt action to put an end

---

[13] /    The Second Circuit further concluded that the sheriff's acquiescence in the harassment could be inferred from the evidence of the existence of the code of silence, adherence to which was a routine factor in the jail's operation, and as to the sheriff's insistence on adherence to that code. Id. Also supporting the inference of acquiescence was the evidence that the daily harassment of the plaintiffs was widespread and inconspicuous. Id.

to harassment and disparagement. Id. Thus, the court held that based on the sheriff's failure to make any effort to forestall, halt or address the retaliatory conduct, a jury could find that, even if the sheriff did not directly cause the retaliation, he either acquiesced in it or was deliberately indifferent to the reprisals. Id. at 63-64. Finally, because the sheriff was the county's final policymaker with respect to the conduct of staff members, the evidence submitted could support a finding of liability on the county. Id.

Jeffes highlights the deficiencies in Santiago's opposition to Hartford's motion. For example, the Jeffes plaintiffs produced extensive and detailed evidence, including deposition testimony by policymakers, which demonstrated the policy in place, the sheriff's personal involvement, acquiescence, causation and policymaking authority. Here, Santiago produced nothing. Accordingly, summary judgment should have been entered in favor of Hartford.

In Vann v. City of New York, 72 F.3d 1040 (2d Cir. 1995), the Second Circuit held that a material issue of fact existed as to whether the police department had shown a deliberate indifference to the need to monitor abusive police officers who had been returned to active duty. As part of its analysis, the Vann court recognized that deliberate indifference might be inferred if complaints are followed by no "meaningful attempt" on the part of the municipality to investigate or to forestall further incidents. 72 F.3d at 1049. "Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was 'contrary' to the practice of most police departments...." Id.

In Vann, the plaintiff presented evidence of the police department's general methods of dealing with problem policemen and of its response to past incidents involving the officer at issue. Id. at 1050 (discussing in detail deposition testimony). In sum, the Second Circuit concluded that based on the evidence, a jury could find that, where an officer had been identified by the police department as a "violent-prone" individual who had a personality disorder

30

manifested by frequent quick-tempered demands for "respect" escalating into physical confrontations for which he always disavowed responsibility, the need to be alert for new civilian complaints filed after his reinstatement to full-duty status was obvious. Id. at 1051.[14]

Here, unlike the plaintiff in Vann, Santiago has produced no evidence. Moreover, she has failed to satisfy Vann's definition of "deliberate indifference." She did not introduce evidence that the HPD made no "meaningful attempt" to investigate complaints. Nor did she introduce expert testimony that any practice by the HPD was contrary to the practice of most police departments. 72 F.3d at 1049. To the contrary, she has "admitted" that all fourteen complaints were "investigated" and that officers were disciplined and arrested. (Hartford's & Pl.'s Local R. 56(a) Statements, ¶¶ 14-15, 21) Accordingly, under Vann, summary judgment should be entered in favor of Hartford. Fed. R. Civ. P. 56(e) ("shall enter forthwith").

In Harris v. City of Pagedale, 821 F.2d 499 (8th Cir. 1987), the plaintiff, an arrestee, who had been sexually assaulted by a police officer brought a § 1983 suit against the city and the officer. The Eighth Circuit affirmed a jury verdict holding that: (1) the plaintiff had established that there existed in the city a custom of failing to investigate or act on citizen complaints of physical and sexual misconduct by officers; (2) evidence supporting a determination that the Board of Aldermen, its members and chief of police had final authority to establish a custom of deliberate indifference to a known pattern of misconduct; and (3) the plaintiff had established that the custom proximately caused the sexual assault. Specifically, the plaintiff's evidence

---

[14] /    It further concluded that a jury could find that the department's election to staff its advocate's office (the unit responsible for monitoring police officers who were on disciplinary probation) with the equivalent of just 1¼ employees to monitor 200 problem officers, together with the systematic lack of communication to the supervisory divisions of information with regard to new civilian complaints, including the Performance Analysis Unit's routine failure, despite its expertise, to instruct commanders to relay that information reflected a deliberate indifference on the part of the municipal defendants to the dangers posed by problem policemen who had been restored to full-duty service. Id.

31

demonstrated that there existed in the city a municipal custom of failing to receive, investigate or act on citizen complaints of physical and sexual misconduct by police officers. Id. at 504. As part of its analysis of the evidence, the Eighth Circuit recognized that the plaintiff's testimony was "corroborated by extensive evidence of prior incidents." Id. at 501.

Moreover, the city conceded that its officials "may not have diligently pursued citizen complaints." Id. at 504. City officials and city residents also testified that similar accusations had been made against the officer in question and other police officers by many other victims. Id. Despite notice of many complaints, city officials "did not investigate or respond to citizen complaints of sexual misconduct by police officers in any meaningful way." Id. at 505. The Eighth Circuit held that the plaintiff had proven that officials in position of authority "repeatedly failed to take any remedial action." Id. at 506. Thus, it concluded that the evidence amounted to deliberate indifference to police abuses and the plaintiff had proven the existence of a municipal custom sufficient to support municipal liability under § 1983. Id.

In the instant case, unlike the situation in Harris, the plaintiff has produced no evidence, let alone, "extensive" corroborating evidence. Moreover, unlike the plaintiff in Harris, Santiago has not proven a repeated failure by the HPD to either investigate complaints or to take remedial action. To the contrary, she has *admitted* that HPD did investigate and did impose discipline. (Hartford's & Pl.'s Local R. 56(a) Statements, ¶¶ 14-15, 21) Accordingly, Harris supports the entry of summary judgment in favor of Hartford.

## H.    The Case Law Addressing Allegations Of Sexual Misconduct Support The Granting Of Hartford's Motion For Summary Judgment

Neither Santiago nor the Court has identified any case which holds that a municipality can be held liable because it failed to train its police officers not to sexually assault its inhabitants. A thorough review of the decisions which have addressed efforts to impose liability on municipalities under § 1983 in situations involving allegations of sexual assaults by police

32

officers or other employees confirms that the Court erred in not granting Hartford's motion for summary judgment.[15]

In Barney v. Pulsipher, 143 F.3d 1299 (10th Cir. 1998), two former inmates who were sexually assaulted by a jailer each brought § 1983 actions against the county and others. The Tenth Circuit affirmed the entry of summary judgment in favor of the county and sheriff. With regard to the plaintiffs' failure to train claim, the court recognized that the plaintiffs had "not come forward with evidence pertaining to the adequacy of the instruction" that the jailer had received. Id. at 1308. Thus, it had no reason to conclude that the jailer had received constitutionally deficient training. Id. Moreover, it recognized that even if the training was less than adequate, it was not persuaded that "a plainly obvious consequence of a deficient training program would be the sexual assault of inmates. Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."

In Thomas v. City of Clanton, 285 F.Supp.2d 1275 (M.D. Ala. 2003), a detainee brought a § 1983 action against a city and others, alleging violations of his Fourth Amendment right to be free from unreasonable searches and seizure and his Fourteenth Amendment right to bodily integrity. He claimed that the municipality should be liable for the violation of its Fourteenth Amendment because of its deliberate indifference to the risk created by a failure to train its officers in the proper methods of strip searches. Id. at 1284. While it was unclear to the court whether or not the police department actually had a policy on body searches, or properly trained

---

[15]    See T.R. v. Kansas City Missouri Public Sch. Dist., 294 F.3d 1025, 1029 (8th Cir. 2002) (no "'patently obvious' need for public schools or principals to train volunteers not to commit felonies at home and in their private lives"); Floyd v. Waiters, 133 F.3d 786, 796 (11th Cir. 1998), reinstated, 171 F.3d 1264 (11th Cir. 1999) (Board was entitled to rely on the "common sense of its employees not to engage in wicked and criminal conduct"); Sewell v. Town of Lake Hamilton, 117 F.3d 488 (11th Cir. 1997) (adopting Walker); Johnson v. CHA Security Officers, 1998 WL 474138, at *2 (N.D. Ill. Aug. 6, 1998) (granting motion to dismiss failure to supervise claim because housing authority was not constitutionally deficient for failing to train its officers not to sexually assault tenants and visitors since such assaults were "clearly contrary to the basic duties of the [officers] and fundamental norms of human conduct.").

officers on how to conduct legal searches, the court concluded that that uncertainty did not preclude the entry of summary judgment. Regardless of whether there was actually any training or whether the training was proper, the plaintiff also needed to prove that the lack of training was the "'moving force'" (cause) behind his injuries in order to properly assert a claim against the municipality. Id. The court recognized that the plaintiff was not alleging that the officer in question conducted an inappropriate search because he was confused about the situations under which a strip search would be legal or that the officer needed additional guidance from his supervisors. Instead, the claim was that the officer *intended* to conduct an unconstitutional strip search. Thus, the court held that "where it appears that [the police officer in question] intentionally violated [the plaintiff's] rights, no amount of training would have prevented the violation." Thomas, 285 F.Supp.2d at 1284 (citing Walker and Sewell).

In Andrews v. Fowler, 98 F.3d 1069 (8th Cir. 1996), a decision discussed in the August 2 Ruling, a woman raped by a police officer while a minor, brought an action against the municipality others under § 1983. The Eighth Circuit affirmed the granting of summary judgment on the plaintiff's failure to train claim. Id. at 1076-77. In doing so, the court recognized that "[i]n light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the City to specifically train officers not to rape young woman." Id. at 1077. Moreover, the Eighth Circuit held that even if the training was in some manner deficient, the plaintiff could not demonstrate the "close relationship necessary to conclude that the City's failure to properly train [the officer in question] *caused* him to rape [the plaintiff] or even raise a question of fact as to causation." Id. at 1077.

In the instant case, the Court's belief that the common sense rule, i.e., that a municipality need not train its police officers not to commit heinous crimes, did not apply under "Second Circuit jurisprudence" was mistaken. (8/2/04 Ruling, at 16) As demonstrated above, a detailed

34

analysis of <u>Walker</u>, <u>Jeffes</u> and <u>Vann</u> reveals that they support the entry of summary judgment in favor of Hartford.  Accordingly, Hartford's motion should be granted based on the common sense rule.

## I.    The Court Failed To Apply The Common Sense Rule As Mandated By <u>Walker</u>

With regard to the Court's specific reference to the proposition that the common sense rule does not apply – "if the municipality has notice that its employees are deviating [from] their expected standard of conduct," (8/2/04 Ruling, at 16), that reference is based on an inaccurate reading of <u>Walker</u>.  Specifically, <u>Walker</u> noted that a plaintiff might be able to survive summary judgment under the common sense rule, if the plaintiff could "produce some evidence that policymakers were aware of a pattern of perjury by police officers but failed to institute appropriate training or supervision...." 974 F.2d at 300.  It did not hold that the common sense rule could never apply.  To the contrary, as shown above, <u>Walker</u> is cited by other courts for its recognition of the rule.  As <u>Amnesty America</u> recognizes, <u>Walker</u> only intended that the application of the common sense rule be deferred until after discovery.  <u>See</u> <u>supra</u>, § A.  After the completion of discovery, a plaintiff under <u>Walker</u> must make a specific evidentiary showing to avoid summary judgment under the rule.  <u>Amnesty America</u>, 361 F.3d at 130 n.10.

Here, the August 2 Ruling simply noted that the common sense rule did not apply under certain circumstances.  It did not provide any reasoning as to why the rule did not apply under the undisputed facts of this case, especially given that discovery has been completed.  Such an analysis is mandated under <u>Walker</u> and the conducting of it confirms that Hartford is entitled to summary judgment.  Specifically, the Court has acknowledged that Santiago produced no evidence whatsoever on any HPD policies or customs.  On the other hand, Hartford's evidence demonstrated that the HPD did investigate complaints and that officers were disciplined and arrested.  Santiago "admitted" this in her Local Rule 56(a)2 Statement.  (Hartford's & Pl.'s Local

R. 56(a) Statements, ¶¶ 14-21) Thus, there is no evidence of inaction by Hartford. See Wilson, 6 F.3d at 1240; Walker, 974 F.2d at 300. Accordingly, Santiago cannot avoid summary judgment under the common sense rule.

Moreover, the Court's comments about the lack of evidence regarding Hartford's training and supervision policies raising "questions" about whether rogue officers felt they could prey on women with impunity are also misplaced. (8/2/04 Ruling, at 17) As the Thomas court recognized, under the common sense rule, the lack of certainty about what policies were in place is irrelevant. 285 F.Supp. 2d at 1284. Santiago is not alleging confused conduct that could have been remedied by different training or supervision. She is alleging conduct, rape, which if proven, would constitute a felony. (Compl., ¶¶ 11-23) As such, no amount of training could have prevented such intentional and heinous conduct. Id. at 1284. Further, to the extent that Santiago maintains that she is alleging conduct which could have been corrected by training or supervision, it was her burden to produce evidence regarding the specifics of such training or supervision and to demonstrate how Hartford's training and supervision was *obviously* deficient. See LaMay v. Town of Bloomfield, 62 F.Supp. 2d 583, 589 (D.Conn. 1999); Behrens v. Sharp, 1993 WL 205078, at *1 (E.D. La. June 8, 1993), aff'd 15 F.3d 180 (5th Cir. 1994). She was also required to produce evidence that any such obvious deficiency caused her injuries. See Carr, 337 F.3d at 1231-32. She produced nothing. Accordingly, the Court erred by not granting Hartford summary judgment under the common sense rule.

## II.  THE COURT OVERLOOKED THE STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT AND THE AUGUST 2 RULING CONSTITUTES ERROR UNDER THAT CASE LAW

### A.  The Proper Standard Governing Summary Judgment Under Fed. R. Civ. P. 56

The Court's discussion of the standard governing motions for summary judgment under Rule 56 was mistaken. (8/2/04 Ruling, at 8) Contrary to the August 2 Ruling, the standard is not

36

accurately identified by the statement that "[t]he moving party bears the burden of demonstrating the absence of a genuine issue of material fact." (Id. (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)))

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court examined the standard for summary judgment under Rule 56. It recognized that the "plain language of Rule 56(c) **mandates** the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 322-22 (emphasis added). The moving party only bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. Id. 323.[16] There is, however, no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. Celotex, 477 U.S. at 323. Accordingly, the moving party is entitled to summary judgment when the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. Id. at 323.

Celotex expressly distinguished Adickes, the case which the August 2 Ruling relied upon as identifying the standard of review. Celotex 477 U.S. at 325. It explained that Adickes should not be construed to mean that the burden is on the party moving for summary judgment to

---

[16]    Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the nonmoving party's case." Nora Beverages, Inc. v. Perrier Group of America, Inc., 164 F.3d 736, 742 (2d Cir. 1998).

produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the non-moving party bears the burden of proof. Id. Instead, the Celotex Court recognized that the "burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." Id. Finally, the Court emphasized the important rights conferred upon parties by Rule 56. Specifically, it held that "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that the claims and defenses have no factual basis." Id. at 327.

"Thus the mere possibility that a factual dispute [m]ay exist, without more, is not sufficient to overcome a convincing presentation by the moving party." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980) (cited by August 2 Ruling). The non-moving party may not rest upon mere allegations or denials of the moving party's pleadings, but instead must set forth "specific facts" showing that there is a genuine issue for trial. Perrelli, 2004 WL 1202718, at *1 (citing Fed. R. Civ. P. 56(e)). If the non-moving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Lamay, 62 F.Supp.2d at 588.

**B.      The Court Erred In Its Application Of The Standard Of Review Governing Summary Judgment Motions**

In addition to being contrary to the substantive Supreme Court and Second Circuit case law discussed above, the August 2 Ruling misapplies the standard of review governing motions for summary judgment under Rule 56, as defined by Celotex. Hartford's initial and reply memoranda of law demonstrated the absence of evidence to support Santiago's Monell claims. Contrary to the August 2 Ruling, (8/2/04 Ruling, at 7, 17), that was all that Hartford needed to do

in order to satisfy its burden under Rule 56(c) and <u>Celotex</u>. See <u>Vann</u>, 72 F.3d at 1048. In order to avoid summary judgment, Santiago was required under Rule 56(e), to produce "evidence" establishing a genuine issue of material fact. Fed. R Civ. P. 56(e) (nonmovant "must set forth specific facts" by way of affidavit). <u>See Vann</u>, 72 F.3d at 1049 (requiring "evidence in the record" to defeat summary judgment). In fact, Santiago conceded this in her memorandum of law. (Pl.'s 11/11/03 Mem. of Law, at 2-3 (citing <u>Celotex</u>)) As the August 2 Ruling expressly acknowledges and as demonstrated in detail above, Santiago produced **no** evidence on the dispositive issues. (8/2/04 Ruling at 7, 17, 19)

"[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." <u>Bayway Refining Co. v. Oxygenated Marketing & Trading A.G.</u>, 215 F.3d 219, 224 (2d Cir. 2000). Nevertheless, despite the complete failure in Santiago's proof and without holding that Santiago had established a genuine issue of material fact, the Court held that since Hartford's policies "have not been established on this record they are **reserved** as questions of fact to be determined by a jury." (8/2/04 Ruling, at 19 (emphasis added)) The Court overlooked the other dispositive issues on which Santiago had similarly produced no evidence.

In the face of the complete failure in Santiago's proof, Rule 56(c) and 56(e) mandated the entry of summary judgment. As such, the reservation of issues for the jury constituted legal error. Hartford was not required under Rule 56 to produce the evidence identified by the August 2 Ruling. That was Santiago's burden. Hartford's motion complied with Rule 56 and <u>Celotex</u> and demonstrated that on the record there is no merit to Santiago's <u>Monell</u> claims. Thus, under <u>Celotex</u>, Hartford has a right to have summary judgment entered in its favor. <u>See</u> Fed. R. Civ. P. 56(c) ("judgment sought shall be rendered forthwith"). Accordingly, the Court should reconsider its ruling and enter judgment in favor of Hartford.

**III.    IF NECESSARY, THE COURT SHOULD CLARIFY ITS FINDINGS WITH REGARD TO DELIBERATE INDIFFERENCE UNDER THE <u>WALKER</u> TEST**

If the Court does not agree with Hartford's arguments, it should at a minimum clarify its statements regarding the <u>Walker</u> criteria. (8/2/04 Ruling, at 17) Santiago did not cite <u>Walker</u> and did not submit any argument regarding its three part test for deliberate indifference. Nor did she submit any evidence on the issue. Thus, as Hartford did not concede these issues, the Court cannot make factual findings on them. If this case is submitted to a jury, it will have to make *de novo* findings on all aspects of the deliberate indifference issue.

**CONCLUSION**

For the foregoing reasons, the Court should grant Hartford's motion for reconsideration and enter a judgment in its favor.

Respectfully submitted,

**CO-DEFENDANT
CITY OF HARTFORD**

By _____
James J. Szerejko, Esq.
CT Fed. Bar No. 04326
Eric P. Daigle, Esq.
CT Fed. Bar No. 23486
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT  06103
Tel: (860) 522-6103
Fax: (860) 548-0006
E-mail:  szerejko@halloran-sage.com

Its Attorneys

## CERTIFICATION

This is to certify that on this 16th day of August, 2004, the foregoing was caused to be served via U.S. Mail, postpaid, to:

Angelo Cicchiello, Esq.
Law Offices of Angelo Cicchiello
364 Franklin Avenue
Hartford, CT 06114

William J. Melley III, Esq.
Law Office of William J. Melley III
250 Hudson Street
Hartford, CT 06106

Eric P. Daigle